RICHARD DOYLE, City Attorney (88625)
NORA FRIMANN, Assistant City Attorney (93249)
CHRISTIAN B. NIELSEN, Chief Deputy City Attorney (87972)
CLIFFORD GREENBERG, Sr. Deputy City Attorney (122612)
MAREN CLOUSE, Sr. Deputy City Attorney (228726)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number: (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GLORIA JACQUEZ, individually; R.J., a minor, by and through his guardian *ad litem* Monica Mendoza, individually and as a successor-in-interest to Decedent RICHARD JACQUEZ,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SAN JOSE, JACOB MORRIS, and DOES 1-50, inclusive,<br><br>Defendants. | Case Numbers:  16-cv-05330-NC<br>16-cv-05343-NC<br><br>**DECLARATION OF JACOB MORRIS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CHANDRA JACQUEZ, individually and as successor-in-interest to Richard Jacquez, deceased,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN JOSE, JACOB MORRIS, and DOES 2-10, inclusive,<br><br>Defendants. | |
| This Document Relates To: Both Actions | |

I, Jacob Morris, hereby declare as follows:

1. I am a sergeant with the San Jose Police Department ("SJPD"). I have been employed as an officer with SJPD since 2000.

2. In August 2015, I was an officer assigned to SJPD's MERGE Unit.

3. On August 17, 2015, I was involved with other MERGE Unit officers in executing a Ramey warrant for the arrest of Richard Jacquez for murder.

4. I was briefed, along with other MERGE officers, by Sgt. Shab at around 2:30 pm. The briefing occurred in a parking lot near Snell Avenue and Blossom Hill Road in San Jose.

5. At the briefing, Sgt. Shab told us the following information:

   a. Jacquez was a suspect in a murder that took place in San Jose on August 13, 2015.

   b. Surveillance video showed Jacquez and two other men chasing the murder victim through a building on Lundy Avenue. I viewed several still images of Jacquez taken from the video.

   c. The surveillance video showed Jacquez carrying a gun. Jacquez shot the victim.

   d. One of the other suspects was identified as Matthew Castillo, who was also shown in the video chasing the victim with a gun. On August 16, officers from SJPD's Covert Response Unit (CRU) attempted to arrest Castillo pursuant to a Ramey warrant. Castillo pulled out a gun, and officers shot and killed him.

   e. Jacquez had a prior felony conviction and was identified, in part by his tattoos, as a gang member.

   f. We were receiving information from a confidential informant, who contacted Sheriff's deputies about Jacquez.

  g. The informant said Jacquez enlisted him to help kill a woman named "Raquel," whom Jacquez felt knew too much about the Lundy Avenue murder.

  h. According to the informant, Jacquez planned to kill Raquel at the first opportunity by taking her to a motel and overdosing her with heroin.

  i. According to the informant, Jacquez committed the Lundy Avenue murder with a semi-automatic pistol known as a Tec-9.

  j. The informant advised Jacquez was still carrying the Tec-9, which was loaded.

  k. Sgt. Shab had previous experience with the informant and believed he provided reliable information.

6. Sgt. Shab orchestrated a covert surveillance operation of Jacquez so we could form a plan to take him into custody.

7. I was involved in the MERGE Unit's surveillance of Jacquez. I was driving an unmarked Ford Crown Victoria equipped with lights and sirens. That type of vehicle is easily identified as a police car. Therefore, I did not participate in the covert surveillance of Jacquez, but provided support to the surveillance operation.

8. Throughout the surveillance, I listened to radio communications and heard the updates relayed from the confidential informant providing information to Sheriff's deputies assisting the MERGE Unit in Jacquez's apprehension.

9. Among other information, I learned via the radio communications that Jacquez was in a maroon Honda driven by a woman identified by the informant as Raquel. According to the informant, Jacquez wanted Raquel dead that day and planned to kill her and would therefore not let her out of his sight.

10. I also learned via the radio communications that the informant reported that he saw Jacquez carrying a Tec-9 in a black bag. I understood the Tec-9 was the weapon with which Jacquez committed the August 13 murder. MERGE officers conducting covert

surveillance reported seeing Jacquez place a black bag on the floor of the Honda as he got in and carry a black bag with him as he exited the vehicle at 210 Blossom Hill Road.

11. After Raquel and Jacquez left 210 Blossom Hill Road, with Raquel driving, I heard an officer conducting undercover surveillance report that the Honda had pulled into a parking lot, and Jacquez got out and switched places with Raquel as the driver. As Jacquez walked to the driver's seat, he lifted up his shirt. I know from my training and experience that this is a signal criminals use to indicate they are carrying weapons. I believed Jacquez thought he might be under surveillance and was intending to communicate to anyone following him that he was armed.

12. Shortly after Jacquez began driving the Honda, I heard the report that he had detected the surveillance and was fleeing, toward my location. I began pursuing him in my vehicle, with lights and siren on, southbound on Monterey Highway. I continued following Jacquez as he made a U-turn against a red light, cutting off traffic. I continued following Jacquez northbound on Monterey Highway, then he made three right turns in quick succession, leading to a residential neighborhood.

13. When I made the final right turn, onto Kirkhaven Court, I found myself at the mouth of a cul-de-sac, with Jacquez out of the vehicle and standing in the street about one house away. Jacquez was not running away, but was stationary and facing me. I believed Jacquez had ambushed me and was about to shoot me, so I struck him with my vehicle.

14. I got out of my vehicle, holding my department-approved pistol, and ordered Jacquez to stay down. But almost immediately Jacquez got up and ran, away from me toward the end of the cul-de-sac.

15. I ran after Jacquez. While I was chasing him, I noticed the Honda move down the street and crash into a parked car, then saw the woman identified as Raquel get out of the passenger side.

16. At the end of the cul-de-sac, Jacquez turned toward a house. He ran to the door and put both hands on the doorknob, appearing to try to force open the door. I had no

1  information about the house but believed any occupants were in immediate danger if
2  Jacquez entered. I believed Jacquez might try to take hostages.
3      17.    I believed Jacquez was armed and willing to do whatever it took to get away.
4  My belief was based on the following information of which I was aware: there was probable
5  cause to believe Jacquez murdered a man days earlier during a drug-related robbery; a co-
6  perpetrator of that crime pulled a gun on police attempting to apprehend him the previous
7  day; Jacquez had a criminal history of violence; Jacquez had been carrying that day a semi-
8  automatic pistol, the same weapon he had used in the murder; Jacquez planned to murder
9  Raquel because he believed she knew about the murder; Jacquez had not let Raquel get
10 away from him; Jacquez stated he would shoot it out with police; Jacquez led me and other
11 officers on a high-speed chase that endangered himself, his passenger, and other drivers;
12 after I struck Jacquez with my vehicle, he got up and ran, ignoring my commands to stop.
13     18.    To prevent Jacquez from escaping and entering the house, I shot him. When I
14 began firing, I was at the corner of the garage, and he was approximately 10 to 15 feet away,
15 facing the front door with his back to me and his hands near the doorknob. After I fired
16 approximately three shots, Jacquez spun toward me, and I thought Jacquez was going to
17 shoot me. I continued firing, at least twice more, until Jacquez fell to the ground. Jacquez
18 landed on his back, with his arm underneath him.
19     19.    I immediately put out on the radio "shots fired," and in my first communication
20 with dispatch, I reported "suspect down" and called for fire and paramedics. Jacquez and I
21 were in the yard of 37 Kirkhaven Court, and I gave dispatch the address.
22     20.    I was the only officer on Kirkhaven Court at the time of the shooting. It was
23 several minutes after the shooting before any other officers arrived.
24 //
25 //
26 //
27
28

21. At no point did Jacquez yield to me as I pursued him and commanded him to stop, nor did he give any indication that he intended to surrender.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct. Executed this __1st__ day of __June__ 2018, at San Jose, California.

_JACOB MORRIS_