UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GLORIA JACQUEZ, et al.,

Plaintiffs,

v.

CITY OF SAN JOSE, et al.,

Defendants.

Case No. 16-cv-05330-NC

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

Re: ECF 75

San Jose police officers hatched a plan to arrest Richard Jacquez after a surveillance video made him a prime suspect for a violent murder and robbery. The police surveilled and surrounded Jacquez in his house, but Jacquez delayed his capture by jumping into a companion's car and leading Officer Jacob Morris on a high-speed chase. The chase ended when Jacquez drove to a residential neighborhood and fled his vehicle on foot, at which point Morris intentionally hit Jacquez with his car. Jacquez recovered, got up, and ran limping to a nearby house, but could not open the locked front door. Morris opened fire and shot Jacquez five times, killing him.

Jacquez's family filed suit, alleging constitutional and state law violations. Now, Defendants City of San Jose and Officer Morris move for summary judgment on all claims, asserting qualified immunity over Morris's use of deadly force against Jacquez and arguing that the undisputed facts entitle them to judgment on the remaining claims. Plaintiffs counter that their evidence raises triable issues, principally pointing to the

testimony of Raquel Ascenso, who witnessed the events.

Though the undisputed facts very nearly mandate summary judgment in Defendants' favor on the excessive force claims, a single disputed material fact prevents it: whether Morris feasibly could have warned Jacquez before using deadly force, but did not. Because the reasonableness of Morris's use of force depends in part on whether he properly warned Jacquez, the Court DENIES Defendants' motion for summary judgment as to the Fourth Amendment excessive force and related claims. However, the undisputed facts entitle Defendants to summary judgment on Plaintiffs' claims for inadequate medical care under the Fourth Amendment, for municipal *Monell* liability against the City, and for state law false arrest. The Court GRANTS Defendants' motion as to these claims.

## I.    Procedural Background

This case consolidates separate complaints filed by two sets of Richard Jacquez's family successors. On September 17, 2016, Jacquez's mother and biological son— plaintiffs Gloria Jacquez and R.J., by and through his guardian ad litem Monica Mendoza—filed a complaint individually and as co-successors-in-interest to Jacquez. ECF 1. On September 19, 2016, Jacquez's biological daughter—plaintiff Chandra Jacquez— filed a complaint of her own, also individually and as successor-in-interest to Jacquez. ECF 1 in Case No. 5:16-cv-05343. The two cases were related on October 24, 2016, ECF 12, and a consolidated amended complaint, the operative pleading, was filed on March 23, 2017. ECF 33. The consolidated complaint brings the following eleven claims:

1. Fourth Amendment—Detention and Arrest (42 U.S.C. § 1983)
2. Fourth Amendment—Excessive Force (42 U.S.C. § 1983)
3. Fourth Amendment—Denial of Medical Care (42 U.S.C. § 1983)
4. Substantive Due Process (42 U.S.C. § 1983)
5. Municipal Liability—Ratification (42 U.S.C. § 1983)
6. Municipal Liability—Inadequate Training (42 U.S.C. § 1983)
7. Municipal Liability—Unconstitutional Custom, Practice, or Policy (42 U.S.C. § 1983)
8. False Arrest/False Imprisonment
9. Battery (Wrongful Death)
10. Negligence (Wrongful Death)
11. Violation of Cal. Civil Code § 52.1

*Id.*

Defendants now move for summary judgment on all claims, seeking qualified immunity on the § 1983 claims for Officer Morris's use of deadly force, and attacking the sufficiency of Plaintiffs' evidence on the remaining claims. ECF 75 ("Mot."). Gloria Jacquez and R.J. filed an opposition, ECF 76 ("GJ Opp'n"), and Chandra Jaquez filed a separate opposition. ECF 78 ("CJ Opp'n"). Defendants submitted a reply brief.[1] ECF 79. The Court heard oral argument on the motion on July 11, 2018. ECF 82, 83.

## II. Jurisdiction and Legal Standard

This Court has federal question subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. All parties have consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c). ECF 7, 9, 44 at 6.

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there is a genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *Celotex Corp.v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing substantial law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

//

//

//

---

[1] Defendants raise three objections in their reply brief. First, Defendants object to Plaintiffs' separate oppositions because they collectively exceed the permitted 30-page limit. The Court agrees that leave should have been sought before exceeding the page limit, but finds no remedy is necessary because the briefs are highly duplicative. The Court relies primarily on the first-filed opposition, ECF 76. Second, Defendants object to Ascenso's unsworn statement to the police, ECF 78-2. The Court does not consider this unsworn evidence in its summary judgment decision. Finally, Defendants object to and move to strike Plaintiffs' expert report and testimony. Defendants' arguments on this point go to the weight, not admissibility, of the evidence, so the motion to strike is DENIED without prejudice to raising the objection in a motion in limine.

### III. Factual Background

Because Defendants are the party moving for summary judgment, the Court construes facts in Plaintiffs' favor.[2]

Officer Morris shot and killed Jacquez on August 17, 2015. The incident began when San Jose police attempted to execute an arrest warrant on Jacquez for his role in a violent robbery and murder that had taken place four days earlier, on August 13, 2015. *See* ECF 77-1 (Nisenbaum Decl. Ex. A) (arrest warrant); ECF 75-2 (Shab Decl.) ¶¶ 3–5. The police suspected Jacquez because a "[s]urveillance video showed Jacquez and two other men chasing the murder victim through a building . . . terrorizing him by hitting him with a spiked weapon and pointing guns at him." Shab Decl. ¶ 5b. On August 16, 2015, officers from San Jose's Covert Response Unit (this did not include Morris) apprehended Jacquez's co-suspect, Matthew Castillo, and shot and killed him when Castillo drew a gun. *Id.* ¶ 5d. However, prior to the incident with Jacquez, Morris heard that Castillo "had attempted to duke it out with the police and had been killed." ECF 77-2 (Morris Depo.) at 96.

Leading up to Jacquez's August 17, 2015, apprehension, a confidential informant reported to Santa Clara County Sheriff's deputies—who relayed the information to the MERGE unit,[3] including Morris—that: Jacquez intended to kill nonparty Raquel Ascenso, who was believed to have information about the August 13 events; that, earlier on the day of August 17, Jacquez had been carrying a loaded Tec-9 semi-automatic handgun in a black bag; and that Jacquez had stated he would "shoot it out" with the police before being arrested. Shab Decl. ¶ 7; Morris Depo. at 101–02, 113–15, 118, 122, 130.

On August 17, 2015, the day of the shooting, a team of MERGE officers led by then-Sergeant Brian Shab and including Morris, worked with the Sheriff's deputies and the confidential informant to try to apprehend Jacquez. Shab Decl. ¶¶ 2–22; *see* Morris Depo. at 96–97, 99–101. The MERGE team surveilled Jacquez for most of the day and followed

---

[2] There is no police video of the events to corroborate Defendants' version of the facts. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).
[3] The Mobile Emergency Response Group and Equipment (MERGE) team is a unit within the San Jose Police Department similar to a SWAT team. Morris Depo. at 96.

him to his home at 210 Blossom Hill Road. Shab Decl. ¶¶ 13–21; Morris Depo. at 104–05. The surveillance team observed Jacquez take a black bag like the one containing the Tec-9 into the Blossom Hill Road residence. Shab Decl. ¶ 21; Morris Depo. at 121–22, 124.

While officers surveilled the residence, Jacquez got into a car with Ascenso, and the two drove away while an officer followed. Shab Decl. ¶ 23; Morris Decl. ¶¶ 9, 11; ECF 77-3 (Ascenso Depo.) at 20. By Morris's understanding, no one reported that Jacquez came out of the house still carrying the bag. Morris Depo. at 122, 124. At some point, Ascenso and Jacquez pulled into a parking lot and switched places so that Jacquez was driving. Morris Decl. ¶ 11; Ascenso Depo. at 18, 24. Morris heard a report over his police radio that Jacquez had detected the surveillance and was fleeing in the car with Ascenso toward Morris's location. Morris Decl. ¶ 12.

A high-speed chase ensued, with Morris as the sole officer pursuing Jacquez, and the chase maxing out at "around 60" miles per hour or "a bit faster." Morris Depo. at 102-03, 132–34. During the chase, Morris got a clear view of Jacquez's face. *Id.* at 130–32.

The chase led to Kirkhaven Court in San Jose. *Id.* at 28. Jacquez got out of the car and took off running. Ascenso Depo. at 61. Morris, who testified he feared an ambush as he rounded the corner, intentionally struck Jacquez with his police vehicle at "maybe 25[ or] 30 [miles per hour]." Morris Depo. at 26–33. Morris did not give a command or warning before striking Jacquez with the car. Ascenso Depo. at 61, 110; *see* Morris Depo. at 26–33.

The impact of the vehicle knocked Jacquez to the ground, but Jacquez got back up and continued running away with a limp on his left side. Ascenso Depo. at 100, 140–41. Jacquez ran limping to the front door of a house and tried unsuccessfully to open the door, seemingly because it was locked. *Id.* at 58–59, 63, 115. Unable to open the front door, Jacquez paused hesitantly with his hands out and visible, then turned and ran for several steps toward the side of the house. *Id.* at 115-116, 121-124. Morris moved toward Jacquez, and as Jacquez ran away, Morris fired three shots that hit Jacquez in the back, then shot him two more times before Jacquez fell to the ground. Morris Depo. at 22–25;

1    Ascenso Depo. at 99, 116. According to Ascenso, Morris did not give any warnings,

2    commands, or say anything at all before shooting Jacquez. Ascenso Depo. at 71, 110–11,

3    127–28.

4         After being shot, Jacquez lay on the ground "gasping and kind of like moaning" for

5    "up to probably a minute," while Morris kicked at Jacquez's feet to see if he was

6    responsive. *Id.* at 146. In his first communication with dispatch, Morris reported that the

7    suspect was down and that an ambulance was needed. Morris Decl. ¶ 19; Shab Decl. ¶ 29.

8         It is undisputed that Jacquez was not in fact armed at any point during the pursuit or

9    shooting. Further, Morris testified that Jacquez never verbally threatened him; that Morris

10   never saw a gun or any other object in Jacquez's hands; and that Morris never saw an

11   affirmative sign (like a bulging waistband) that Jacquez had a gun on his person. Morris

12   Depo. at 21.

## IV.  Analysis

14        The Court resolves Defendants' motion for summary judgment as follows. First,

15   the Court evaluates Defendants' claim of qualified immunity for Morris's use of deadly

16   force, which involves assessing the validity of Plaintiffs' underlying Fourth Amendment

17   claims. Second, the Court discusses Plaintiffs' remaining constitutional claims (medical

18   care and substantive due process). Third, the Court analyzes Plaintiffs' theories for

19   municipal *Monell* liability against the City. Finally, the Court summarily addresses

20   Plaintiffs' state law claims.

### A.    Excessive Force and Qualified Immunity

22        The first issue, and the core of this case, is Plaintiffs' claim under 42 U.S.C. § 1983

23   that Officer Morris violated Jacquez's Fourth Amendment rights by using excessive,

24   deadly force against him. Defendants move for qualified immunity on this issue, asserting

25   that no constitutional violation occurred under clearly established law. Plaintiffs disagree,

26   asserting that their version of the facts depicts a Fourth Amendment violation under the

27   deadly force principles articulated in *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985). GJ

28   Opp'n at 12. The Court agrees that *Garner* and cases applying it provide the framework

for assessing Morris's conduct. Under these principles, the Court finds that Plaintiffs' version of the facts does not depict a clearly established constitutional violation, but for one factually disputed issue: whether Officer Morris could have, but did not, warn Jacquez before killing him.

### 1.    Qualified Immunity Legal Standard

As the Supreme Court has explained, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity analysis is two-pronged, querying: (1) whether there was a deprivation of a constitutional or statutory right, and (2) whether that constitutional or statutory right was "clearly established" at the time of the incident. *See Saucier v. Katz*, 533 U.S. 194, 201–02 (2001); *Pearson*, 555 U.S. at 232.

The Court notes that this standard creates a tension on summary judgment: the law is effectively construed in Defendants' favor (i.e. Plaintiffs must show it is "clearly established" against Defendants), while the facts are construed in Plaintiffs' favor. Reconciling these demands, the question is simply whether Plaintiffs' version of the facts depicts a clearly established constitutional violation. *See Saucier*, 533 U.S. at 201; *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059–60 (9th Cir. 2006).

The nugget of clearly established law and that saves Plaintiffs from summary judgment is nestled within precedent that overwhelmingly supports Defendants' position. To give a complete analysis, the Court first discusses the clearly established legal principles that apply to Morris's conduct, which largely support Morris's use of deadly force but also isolate the warn-if-feasible principle as an important disputed point. Then, the Court pauses to discuss whether it was clearly established that the warn-if-feasible principle applied to Morris's conduct. Finally, the Court assesses whether disputed facts raise a triable issue about whether Morris could have warned Jacquez before killing him, but did not.

## 2. Whether Morris Warned Jacquez Is Material to Reasonableness.

The Court first addresses whether the facts could show a constitutional violation, with an eye to the materiality of disputed facts.

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (citing *Graham v. Connor*, 490 U.S. 386 (1989); *Garner*, 471 U.S. 1). This standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake," and must account for the totality of the circumstances. *Graham*, 490 U.S. at 396 (internal quotation marks omitted). This question is analyzed from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

More specific to deadly force, the Supreme Court held that if an officer has "probable cause to believe that [a suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Garner*, 471 U.S. at 11–12.

Here, the majority of the disputed facts, even construed in Plaintiffs' favor, do not show a clearly established constitutional violation under the principles articulated in *Graham* and *Garner*. In *Forrett v. Richardson*, the Ninth Circuit applied these principles to a situation highly analogous to the one here and found no constitutional violation. 112 F.3d 416, 420 (9th Cir. 1997), *abrogated on other ground as recognized in Chroma Lighting v. GTE Prod. Corp.*, 127 F.3d 1136, 1136 (9th Cir. 1997). There, the suspect, Forrett, had committed a violent residential burglary in which he tied up three victims, shot two of them, and then fled the scene with several firearms and ammunition. *Id.* at 418. One of the victims managed to free himself and call the police, and the details of the situation were relayed to responding officers. *Id.* After searching, officers discovered the vehicle Forrett had used to flee, but neither Forrett nor the firearms were inside. *Id.* One

officer spotted Forrett and chased him into a residential neighborhood but stopped, fearing an ambush, when Forrett disappeared behind a house. *Id.* Once backup arrived, the officers continued the pursuit by setting up a perimeter, warning residents to stay indoors, and combing the area on foot. *Id.* Forrett eluded capture for "almost an hour" by jumping fences, running through yards, and even changing his clothes in a woodshed to alter his appearance. *Id.* Eventually, police chased Forrett into a yard with a six-foot fence, where he paused. *Id.* The officers approached, "shouted at Forrett to stop and surrender," and then opened fire. *Id.* The first many shots missed, and Forrett managed to climb over a fence into the adjacent yard. *Id.* The officers continued shooting through the fence and hit Forrett in the back and hip, preventing him from running and allowing another officer to quickly apprehend him. *Id.* at 418–19. Forrett was unarmed when the police captured him, and no guns were found in the vicinity of his capture. *Id.* at 419.

To these facts the Ninth Circuit applied *Garner*, and found that the officers' use of deadly force was objectively reasonable and not a constitutional violation. *Id.* at 420–21. *Forrett's* facts tightly match the ones here, and the case weighs heavily in Defendants' favor. The Court briefly discusses several components of the court's reasoning in *Forrett*, and applies that reasoning to disputed factual issues here.

First, the court in *Forrett* reasoned that because "the officers had probable cause to believe [Forrett] had committed a crime involving the infliction of serious harm," they "had probable cause to believe that Forrett posed a serious threat of harm to them or others." *Id.* at 420. Even with the facts construed in Plaintiffs' favor, Morris had probable cause to believe Jacquez was likely to cause serious physical harm. It is undisputed that Morris knew Jacquez was suspected of robbing and killing a man four days earlier; knew Jacquez had threatened to kill Ascenso; knew Jacquez had threatened to shoot it out with police before being arrested; and had just engaged with Jacquez in a high-speed pursuit that ended in a residential neighborhood.

Along the same lines, the court in *Forrett* expressly held that a felony suspect "need not be armed or pose an immediate threat to the officers or others at the time of the

shooting" to pose a threat of serious physical harm. *Id.* at 420. This holding makes immaterial the parties' dispute about whether it was reasonable for Morris to believe Jacquez could have been armed, as well as their dispute about whether Jacquez was fleeing the whole time. Even under Plaintiffs' view that Morris could not reasonably have believed Jacquez was armed, it was not clearly established that Morris was constitutionally barred from shooting Jacquez if he were unarmed. *See id.* And even if Jacquez was in fact fleeing during the entire encounter, as Plaintiffs contend and Ascenso testified, *Forrett* again indicates that Morris's use of force was nonetheless reasonable.

Furthermore, the Ninth Circuit considered in *Forrett* whether officers should have used less drastic means of capture. The court observed that alternative methods of capture "must be reasonably likely to lead to apprehension before the suspect can cause further harm." *Id.* at 420. But the totality of Forrett's circumstances—the proximity of neighborhood residents, his recently-committed violent crime, and his "demonstrated willingness to take desperate measures" to avoid escape—justified the officers' fear that Forrett would "seize an opportunity to take an innocent bystander hostage" or otherwise cause harm. *Id.* at 420–21. This legitimate possibility made deadly force necessary, relative to any alternatives, to prevent escape.

As with the armed/unarmed dispute and the fleeing/not fleeing dispute, this holding makes immaterial the parties' dispute whether Morris could have employed less drastic means to apprehend Jacquez. It is undisputed that, as in *Forrett*, there was probable cause that Jacquez was willing and even eager to harm others (Ascenso); was willing to take desperate measures to avoid escape (the high-speed chase and declared plan to shoot it out with police); was in close proximity to neighborhood residents; and had attempted to enter one of the residential homes before he was shot. These facts make alternative methods of capture—like simply waiting for backup—indisputably more likely to result in serious harm and, under *Forrett*, justify deadly force as necessary to prevent escape.

Thus, *Forrett* makes clear that the bulk of the parties' factual disputes are immaterial to the ultimate question on Defendants' qualified immunity defense. Even

under Plaintiffs' facts—where Jacquez was unarmed, fleeing, and not directly threatening Morris or others—*Forrett* strongly suggests that Morris's use of force was constitutionally reasonable. At the very least, *Forrett's* existence as legal precedent places the situation Morris encountered squarely into "the sometimes hazy border between excessive and acceptable force" that qualified immunity shields. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (internal quotation marks omitted).

Yet, with all that said, one important difference exists between *Forrett* and this case. In *Forrett*, it was "established" that the officers "warned [Forrett] before using deadly force." *Forrett*, 112 F.3d at 420. This fact satisfied the principle from *Garner* that a warning must be given before using deadly force, "where feasible." *Garner*, 471 U.S. at 12. Here, it is not clear whether Morris warned Jacquez despite having a chance to do so.

### 3. It Was Clearly Established that the Warn-If-Feasible Principle Applied to Morris's Situation.

Before discussing in detail the factual disputes over warnings, the Court pauses to assess whether it was "clearly established" that the warn-if-feasible principle applied to the situation Morris encountered. *Pearson*, 555 U.S. at 232.

Without doubt, *Garner's* broad contours of deadly force principles were well established at the time of this incident, including the notion that deadly force may be used only after a warning has been given, if it is feasible to do so. *Garner*, 490 U.S. at 397; *see also Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) ("[W]henever practicable, a warning must be given before deadly force is employed."). But there is a "longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.' " *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Here, the Court finds that it was clearly established that *Garner's* warn-if-feasible principle applied in situations like the one Morris encountered. First, *Forrett's* reasoning applied the principle to a specific factual circumstance very similar to what Morris

encountered. Even though *Forrett* ultimately found no constitutional violation, it put officers like Morris on notice that warnings, or lack thereof, factor into the reasonableness of deadly force when apprehending violent felony suspects fleeing though residential neighborhoods. *See Hope v. Pelzer*, 536 U.S. 730, 743 (2002) (finding "[t]he reasoning, though not the holding" of a case put reasonable officers on notice); *cf. Hernandez v. City of San Jose*, No. 17-15576, 2018 WL 3597324, at *8–10 (9th Cir. July 27, 2018) (affirming the denial of qualified immunity and finding that the state-created danger doctrine's applicability to crowd control settings had been clearly established by the reasoning of an earlier case that found no constitutional violation).

Furthermore, less-similar but still-analogous cases have found that the failure to warn can make use of deadly force unreasonable. In *Gonzalez v. City of Anaheim*, the Ninth Circuit considered an officer's use of deadly force when the officer ended up inside a suspect's moving minivan and shot the suspect in the back of the head. 747 F.3d 789 (9th Cir. 2014). The court held that a jury could find the officer had failed to warn the suspect, and that while "[t]he absence of a warning does not necessarily mean that [the officer's] use of deadly force was unreasonable [,] . . . . [a] rational jury may find . . . [that] a warning was practicable and the failure to give one might weigh against reasonableness." *Id.* at 797 (citing *Scott*, 550 U.S. at 383; *Deorle v. Rutherford*, 272 F.3d 1272, 1283–84 (9th Cir. 2001)).

Finally, to the extent earlier precedent does not clearly establish the need to warn (if feasible) in circumstances perfectly matching with those here, it is still acceptable to hold Morris to this standard because factual flexibility is built in. The rule is warn *if feasible*. By its nature, this general rule can rightly be applied to most uses of deadly force, because it accounts for on-the-ground challenges officers may encounter in legally novel scenarios. Moreover, no unusual circumstances existed here to override this default expectation. *Contra White v. Pauly*, 137 S. Ct. 548, 552 (2017) (finding an officer's late arrival on the scene excused his failure to warn before shooting, because it was not clearly established that a late-arriving officer could not rely on his earlier-arriving colleagues to have given

warning). Holding Morris to this requirement here does not grind against the overarching principles of qualified immunity that seek to shelter officers who find themselves in untrammeled legal hinterlands.

For all these reasons, the Court finds it was clearly established at the time of the incident and under the specific circumstances Morris encountered, that the reasonableness of Morris's deadly force depended in part on whether he first warned Jacquez, if it was feasible to do so. *See Forrett*, 112 F.3d at 420.

Before turning to the facts, there is one additional legal wrinkle: whether this legal finding extends to Morris's vehicle strike. *Garner*, *Forrett*, *Gonzalez*, and other deadly force cases have typically dealt with guns, not cars. Off the bat, Defendants do not contest that the vehicle strike should be evaluated as "deadly force" for purposes of this motion. Mot. at 17 n.10. However, the Supreme Court has previously rejected a rigid application of *Garner* to a vehicle strike in the context of a high-speed car chase. *Scott*, 550 U.S. at 382. In *Scott*, an officer used "deadly force" by bumping the fleeing suspect's car with his police vehicle in an effort to end the high-speed chase. *Id.* The Court cautioned that "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force,' " and it refused to apply *Garner* straightforwardly to the context of a high-speed car chase. *Id.*

Here, even accounting for this admonition, the Court finds that the principles articulated in *Garner* and applied in *Forrett* apply to Morris's car strike, because the facts in *Forrett* so tightly parallel those here. In other words, *Forrett's* factual applicability here is not tenuous as *Garner's* was in *Scott*. While Morris's use of a car, rather than a bullet, may ultimately change what the jury determines in terms of feasibility and reasonableness, "[a]n officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury." *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994), as amended (May 31, 1994). The law was clear in August 2015 that, when possible, officers should give warning to felony suspects fleeing on foot through residential neighborhoods before potentially taking their lives. The Court sees no

reason to abandon this principle based simply on Morris's choice of deadly instrument. Thus, the Court finds that Morris can be held to the warn-if-feasible principle in determining the reasonableness of his both his car strike and his gunshots.

Having established that this principle applies to the vehicle strike as well as more conventional forms of deadly force, the Court returns to the constitutional violation analysis and its material facts.

### 4. It Is Disputed and Material Whether Morris Warned Jacquez.

With the warn-if-feasible principle in mind, the Court discusses each use of deadly force to determine if it was feasible to give a warning, and if so, if one was given. The Court separately addresses the car strike, the first three-shot volley, and the second two-shot volley. *See Thomas v. Dillard*, 818 F.3d 864, 874 (9th Cir. 2016), as amended (May 5, 2016) ("We evaluate separately the constitutionality of each distinct Fourth Amendment intrusion.").

#### a. Vehicle Strike

The first contested Fourth Amendment intrusion is the vehicle strike. It is undisputed that Morris deliberately drove his car into Jacquez while Jacquez was on foot, and Morris estimated he was driving around 25 or 30 miles per hour when he hit Jacquez. Morris Depo. at 27. It is also undisputed that Morris did not warn Jacquez before hitting him with the car. *See* Morris Depo. at 29–34. The question for this use of force is therefore whether a warning was feasible. Under Morris's version of the facts, it was not: Morris claims he drove around the corner, saw Jacquez standing and facing him, feared from Jacquez's posture that he was being ambushed, and decided to hit him. Morris Depo. at 29–34. Morris claims he had "around a second . . . [g]ive or take tenths of seconds" to decide what to do. *Id.* at 31, 33. Under this version of the facts it is difficult to see how a jury could find that a warning was feasible.

But Ascenso's testimony raises a triable issue on this point. Despite being unclear and vague, her testimony contradicts Morris's account by suggesting that Jacquez was running from the moment he left the car until he reached the front door of the house:

| Q | When he jumped out of the car what was the next thing? |
|---|---|
| A | He ran. |
| Q | And then what else occurred? Anything? |
| A | What do you mean, anything? He ran to the door and then got shot. |
| Q | Did he get hit by a police car? |
| A | Yes, he did get hit by a police car. I totally forgot about that until right now. Yes, he did. |
| Q | That's why I asked you about it. |
| A | Yeah, he kind of stumbled down on the floor. I'm sorry. He kind of stumbled a little bit and then he kept running, so he did get hit by a police car. |

Ascenso Depo. at 61. While this testimony is far from clear about the sequence of events or the timing of the vehicle strike, Ascenso's testimony (weakly) contradicts the basis for Morris hitting Jacquez. If Jacquez was running, rather than facing Morris, there may have been more of an opportunity for a warning than Morris's testimony suggests.

Furthermore, believing Morris's account requires a credibility determination in his favor—something squarely in the jury's purview. The Ninth Circuit has warned that on summary judgment, courts "may not simply accept what may be a self-serving account by the police officer" in deadly force cases where "the witness most likely to contradict [the officer's] story—the person shot dead—is unable to testify." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Because Ascenso's testimony contradicts Morris's potentially self-serving account, the Court finds that there is a triable issue as to whether a warning was feasible before Morris hit Jacquez with his car. This possibility must be factored into the overall reasonableness assessment. *See Gonzalez*, 747 F.3d at 797.

### b. First Three-Shot Volley

The next use of deadly force is the three-shot volley that Morris fired while Jacquez was at the front door of the house. Defendants claim that Morris gave "commands to stop or he would be shot," Mot. at 15, and Morris testified that he gave unspecified "commands" as Jacquez ran toward the house. Morris Depo. at 64. But Ascenso's account directly contradicts this, testifying that Morris did not give any warnings, commands, or say anything else prior to shooting. Ascenso Depo. 71, 110–11, 127–28. By claiming Morris gave warnings, Defendants necessarily do not dispute the feasibility of

a warning, so the only disputed issue is whether Morris did, in fact, warn Jacquez before he shot him. A jury must weigh Morris's and Ascenso's testimony to make this determination, and decide whether their conclusion on the issue makes Morris's use of force unreasonable.

### c. Second Two-Shot Volley

The third and final use of deadly force is the two-shot volley that Morris fired after already shooting Jacquez in the back three times. The Court finds that Ascenso's testimony precludes summary judgment on the second volley as well. If a jury finds that Morris did not give any warnings at any point in time, and if it finds that warnings were feasible, then it could conclude that both the first and second volley were constitutionally unreasonable.

### 5. Conclusion on Fourth Amendment Deadly Force Claim

In sum, Plaintiffs raise a single triable issue on their deadly force claim. It was clearly established at the time of the incident that the reasonableness of Morris's potentially deadly actions depended on whether he first warned Jacquez, if feasible. Because there is a triable question of feasibility on the car strike, and a triable question of whether warnings were given before each of the gunshot volleys, the Court DENIES Defendants' motion for summary judgment on Plaintiffs' Fourth Amendment deadly force claim.

## B. Fourteenth Amendment

Defendants next move for summary judgment on Plaintiffs' Fourteenth Amendment substantive due process claim for deprivation of their liberty interest in Jacquez's companionship. To make out a substantive due process claim, Plaintiffs must show that Morris's conduct "shocks the conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). One of two standards applies, depending on whether the situation "evolve[d] in a time frame that permit[ted] the officer to deliberate before acting" on the one hand, or "escalate[d] so quickly that the officer [had to] make a snap judgment" on the other. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). In the former situation, a

"deliberate indifference" standard applies, meaning "something more than negligence but less than intentional conduct, such as recklessness or gross negligence." *Lewis*, 523 U.S. at 849 (internal quotation marks omitted). And in the latter situation, "where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013).

Here, there is a triable issue under either standard, because Ascenso testified that she saw Morris "smirk" while handling Jacquez's body after the shooting:

> Q    What would you say the officer's demeanor [was] when you saw him after
>       the shooting and he looked at you?
> A    The same officer that shot him . . . moved his body and they carried his
>       body. And he looked at me, the same officer, and he looked at me with like
>       a smirk like on his face or something carrying his body.
> Q    What do you mean by a smirk? What do you mean by that?
> A    Like, "I got him," or something. Like I don't know. Like this kind of look.
>       . . . So I literally seen him die and then I seen him in a sheet. . . . He wanted
>       me—like he looked at me like he wanted me to see that. He looked at me
>       like he wanted me to see that he was gone. You know what I'm saying? I
>       can't explain it.

ECF 78-3 (Ascenso Depo.) at 119.

Though only marginally probative, this testimony raises a genuine dispute about Morris's motive in killing Jacquez. Combined with the disputed issue of whether Morris ever warned Jacquez before using deadly force, a jury could find under either the "deliberate indifference" or "purpose to harm" standard that Morris's conduct "shocks the conscience." Defendants' motion for summary judgment on Plaintiffs' Fourteenth Amendment claim is DENIED.

## C.    Failure to Provide Medical Care

Next, Defendants move for summary judgment on Plaintiffs' claim for inadequate medical care under the Fourth Amendment. Plaintiffs do not oppose the motion on this claim. *See generally* GJ Opp'n; CJ Opp'n.

"[A] police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment." *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006). Morris satisfied this requirement when he reported in his first communication with dispatch after the shooting that Jacquez was down and that an ambulance was needed. Morris Decl. ¶ 19; Shab Decl. ¶ 29. Defendants' unopposed motion on this claim is GRANTED.

### D.    Municipal Liability

In addition to the claims against Morris, Defendants move for summary judgment on Plaintiffs' claims for municipal liability against the City. Plaintiffs oppose the motion on this claim, arguing the City is liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) for (1) its failure to properly train officers; (2) ratifying Morris's conduct; and (3) its custom of unconstitutional policing. *See* GJ Opp'n at 15; CJ Opp'n at 2 (joining the GJ Opp'n). Because summary judgment is denied on the underlying Fourth Amendment § 1983 claim against Morris, the Court considers whether the City could be liable for Morris's actions under any of these theories.

#### 1.    Failure to Train

As to the first theory of *Monell* liability, it is true that "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). However, failure to train is the "most tenuous" theory of *Monell* liability, *id.*, requiring a plaintiff to prove "deliberate indifference"—a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of Comm'rs of Bryan County. v. Brown*, 520 U.S. 397, 410 (1997). This type of indifference may be shown when, for example, "policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights" but still choose to retain that program. *Connick*, 563 U.S. 51, 61. "A *pattern* of similar constitutional violations by untrained employees is 'ordinarily necessary' to

Case No. 16-cv-05330-NC                18

demonstrate deliberate indifference for purposes of failure to train." *Id.* (emphasis added) (quoting *Bryan Cty.*, 520 U.S. at 409).

Here, Plaintiffs make no effort to point to evidence about Morris's (or any other officer's) training. Instead, Plaintiffs merely allude to "multiple instances of shooting non-threatening suspects in the back, including unarmed suspects," and claim that the City's officers "have a propensity to shoot toward residences that may be occupied." GJ Opp'n at 15. With no evidence to support their position, this claim is subject to summary judgment.

### 2. Ratification

On Plaintiffs' second theory of *Monell* liability, ratification occurs only where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

Here, Plaintiffs' argument consists solely of their claim that "[t]here is no evidence that Defendant City disciplined or retrained Defendant Morris for his unwarranted shooting of Jacquez or for his reckless shooting into an occupied home." GJ Opp'n at 16. There is precedent supporting the proposition that a supervisor's failure to investigate and discipline an officer may be probative of a pre-existing policy of condoning police misconduct that then gave rise to the constitutional violation. *See Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991). But *Larez* does not lend support to the notion that a plaintiff can "establish ratification by deliberate indifference towards a single after-the-fact investigation." *Cole v. City of Emeryville Police Dep't*, 387 F. Supp. 2d 1084, 1101 (N.D. Cal. 2005). To the contrary, "courts in this circuit have stopped short of holding that a plaintiff can prove *Monell* liability simply on the basis of a defendant department's post-incident ratification through failure to discipline or take other action concerning the officer directly involved." *Mueller v. Cruz*, No. 13-cv-01274-CJC, 2015

WL 9455565, at *3 (C.D. Cal. Dec. 23, 2015).

Plaintiffs' sole citation in support of their position is readily distinguishable. In *Villarreal v. Cooper*, 929 F. Supp. 2d 1063, 1077 (E.D. Wash. 2013), the police chief "stated explicitly that he believe[d] that all of [the officer]'s actions were in accordance with department policy and that he support[ed] all of [the officer]'s actions." Plaintiffs offer no evidence of this type of affirmative ratification here, nor any other evidence in support of their claim.

### 3. Unconstitutional Custom, Policy, or Practice

Finally, on Plaintiffs' third theory, "[l]iability for custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). As with the failure to train argument, no evidence—just accusation—is offered of this kind of practice or tradition. *See* GJ Opp'n at 15.

In sum, because Plaintiffs offer no evidence in support of any of their three *Monell* theories, the Court GRANTS Defendants' motion for summary judgment on Plaintiffs' municipal liability claims.

### E. State Law Claims

Defendants move for summary judgment on all of Plaintiffs' state law claims. These claims are asserted against Morris directly and against the City vicariously. Compl. ¶¶ 94, 103, 111, 122. The Court's determination of these claims applies to both Defendants because, unlike federal law, California state law "allows for vicarious liability of a public entity when one of its police officers uses excessive force in making an arrest." *Blankenhorn v. City of Orange*, 485 F.3d 463, 488 (9th Cir. 2007) (discussing Cal. Gov't Code § 815.2(a) and citing *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 215–16 (1991)).

### 1. False Arrest/False Imprisonment

First, Defendants move for summary judgment on Plaintiffs' false arrest claim,

United States District Court
Northern District of California

arguing Morris cannot be liable based on California Penal Code § 847. Plaintiffs do not oppose the motion on this claim.

Under § 847(b)(1), a peace officer cannot be liable if "[t]he arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful." Cal. Penal Code § 847(b)(1). And under § 847(b)(2), a peace officer cannot be liable if "[t]he arrest was made pursuant to a charge made, upon reasonable cause, of the commission of a felony by the person to be arrested." Cal. Penal Code § 847.

Here, it is undisputed that Morris pursued and apprehended Jacquez pursuant to a valid arrest warrant for a violent felony. The Court GRANTS Defendants' unopposed motion for summary judgment on this claim.

### 2. Battery and Negligence (Wrongful Death)

Next, Defendants move for summary judgment on Plaintiffs' battery and negligence claims. These tort claims parallel Plaintiffs' Fourth Amendment excessive deadly force claim, hinging on the reasonableness of Morris's actions. *See Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272–73 (1998) (battery); *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 639 (2013) (negligence). Because disputed facts about Morris's issuance of warnings bars summary judgment on the Fourth Amendment claim, they do so here as well. Defendants' motion on these claims is DENIED.

### 3. Bane Act, California Civil Code § 52.1

Finally, Defendants asserts Plaintiffs have provided inadequate evidence to prevent summary judgment on their Bane Act claim.

The Bane Act makes actionable "interfere[nce] by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California.]" Cal. Civ. Code § 52.1. "[T]he elements of [an] excessive force claim under Civil Code § 52.1 are the same as under § 1983." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir.

2014). However, in addition, "the Bane Act requires 'a specific intent to violate the arrestee's right to freedom from unreasonable seizure.' " *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting *Cornell v. City & Cty. of San Francisco*, 17 Cal. App. 5th 766, 801 (Cal. App. 2017)). In other words, it must be that the officer "intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances." *Id.* at 1045 (internal quotation omitted) (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993)).

As with the Fourteenth Amendment substantive due process claim, Plaintiffs avoid summary judgment on this claims based on Ascenso's testimony that Morris "smirk[ed]" at her when he was moving Jacquez's body. Ascenso felt like Morris was saying "I got him" and "wanted [Ascenso] to see" Jacquez's dead body wrapped in a sheet. Ascenso Depo. at 119. Combined with the triable issues of whether Morris failed to warn Jacquez before killing him, Plaintiffs' evidence sufficiently calls into question whether Morris intended the unreasonableness of his force. Defendants' motion for summary judgment on this claim is DENIED.

## V. Conclusion

In sum, Defendants' motion for summary judgment is:

- DENIED on Plaintiffs' deadly force claims under the Fourth Amendment and 42 U.S.C. § 1983 (Counts 1 and 2 of the consolidated amended complaint);

- GRANTED on Plaintiffs' denial of medical care claim under the Fourth Amendment and 42 U.S.C. § 1983 (Count 3);

- DENIED on Plaintiffs' substantive due process claim under the Fourteenth Amendment and 42 U.S.C. § 1983 (Count 4);

- GRANTED on Plaintiffs' claims for municipal *Monell* liability against the City (Counts 5, 6, and 7);

- GRANTED on Plaintiffs' state law claim for false arrest and false imprisonment (Count 8); and

- DENIED on Plaintiffs' remaining state law claims for battery, negligence, and

violation of the Bane Act, California Civil Code § 52.1 (Counts 9, 10, and 11).

The claims remaining after summary judgment are for (1) excessive, deadly force under the Fourth Amendment and § 1983 against Morris only; (2) substantive due process under the Fourteenth Amendment and § 1983 against Morris only; (3) state law battery against Morris and the City; (4) state law negligence against Morris and the City; and (5) Bane Act violation against Morris and the City.

**IT IS SO ORDERED.**

Dated:  August 6, 2018

_____
NATHANAEL M. COUSINS
United States Magistrate Judge